IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| INTELLDENT CORPORATION | CASE NO. 13 C 638 |
| Plaintiff, | |
| | JUDGE RONALD A. GUZMAN |
| v. | |
| | MAGISTRATE JUDGE MARIA VALDEZ |
| INTERNATIONAL PLASTICS LLC, *et al.* | |
| Defendants | |

**PLAINTIFF INTELLDENT CORPORATION'S
POST-HEARING BRIEF**

**I.    INTRODUCTION**

Plaintiff, Intelldent Corporation ("Intelldent"), submitted sufficient, undisputed evidence at the temporary restraining order/preliminary injunction hearing held on February 15, 2013, such that this Court may issue a temporary restraining order and/or preliminary injunction pending trial. Alternatively, it is requested that this Court issue a temporary restraining order to last until the conclusion of any continued preliminary injunction hearing scheduled by the Court.

In order to be entitled to a temporary restraining order or preliminary injunction, Plaintiff must demonstrate it is entitled to same by proof of the following four elements based upon clear and convincing evidence:[1]

1. Plaintiff is likely to succeed on the merits of its claims;

2. Plaintiff is likely to suffer irreparable harm without an injunction.

3. The harm that Plaintiff will suffer without an injunction is greater than the harm that preliminary relief would inflict upon Defendants.

4. The injunction is in the public interest.

---

[1] For purposes of staying within page limits established by the Court, the Plaintiff incorporates herein case citations set out in prior briefs filed in support of its motions for temporary restraining order and for preliminary injunction.

The discussion below will flesh out each of these elements, and also will address Defendants' claims that Plaintiff should be denied a preliminary injunction because it engaged in laches and/or it has unclean hands.

## II. BASED UPON UNREFUTED EVIDENCE, PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION

### A. Plaintiff is likely to succeed on the merits of its claims.

It is uncontroverted that Defendants were directors and officers (vice presidents) of Plaintiff. (Exhibit 18[2]; T. 50-51) "It is well established that corporate officers and directors have a fiduciary relationship with their corporation. Among those duties, which officers and directors owe their corporation, are undivided loyalty, good faith, honesty, and full disclosure." *Leavitt v. Leisure Sports Incorporation*, 103 Nev. 81, 92, 734 P.2d 1221, 1228 (Nev. 1987). Directors and officers breach their fiduciary duty if they "exploit an opportunity that belongs to the corporation." *Bedore v. Familian*, 122 Nev. 5, 12, 125 P.3d 1168, 1173 (2006), quoting *Leavitt*, 103 Nev. at 87, 734 P.2d at 1225. "An opportunity belongs to the corporation if it is one in which the corporation has an expectancy interest or property right." *Id.*

A former officer or director remains bound by his fiduciary duty not to undertake any transaction founded on information he acquired during his employment. See *Dowell v. Bitner*, 273 Ill. App. 3d 681, 691 (4th Dist. 1995); *Comedy Cottage v. Berk*, 145 Ill. App. 3d 355, 360-61 (1st Dist. 1986). In *Elcor, Inc. v. Murray*, 1997 WL 136278 (March 20, 1997 N.D. Ill.), the court stated at *9 that, "even assuming *arguendo* that the [defendant] did not begin competing with [the corporation] until after his resignation, he would remain bound by his fiduciary duty not to

---

[2] The parties have stipulated to the admission into evidence of all exhibits contained in the exhibit book provided to the Court and the witnesses at the hearing. To the extent Defendants submit additional exhibits in their post-hearing pleadings, Plaintiff does not stipulate to the admission into evidence of any such exhibits.

2

undertake a transaction founded on information acquired during his employment."[3] In addition to being officers and directors, each of the individual Defendants, Mark Arthur Fiorina and Mark Andrew Fiorina, executed an employment agreement (Exhibits 19 and 38), and each agreed to use their skill to "promote, develop and expand the business" of their employer, Plastic Dental Corporation. (Exhibit 38, p. 2, Section 2.01(a))

> 1. **The work performed by Mark Fiorina, Sr. and Mark Fiorina, Jr. was done in the course of their employment by Plastic Dental/Intelldent, and they are prohibited from using that information in competition with Plastic Dental/Intelldent.**

Mark Fiorina, Sr. was recognized to have "extraordinary and unique skill, talent and ability to conduct and promote the business of Plastic Dental." (Exhibit 38, Employment Agreement, p. 1) He was brought into Plastic Dental as the manufacturing and engineering employee on the team. (T. 115) No one else on the five-person team had that capability. (T. 114-15) In that capacity, his job was to use his skill to "promote, develop and expand the business" of Plastic Dental. (Exhibit 38, Employment Agreement, p. 2)

Invention of the multi-piece tip certainly was in the scope of Plastic Dental's business, it was confidential (as admitted by Mr. Fiorina; see discussion in Part A.2. below) and all officers and directors had a fiduciary obligation to maintain the information as confidential and to use it for the benefit of the company and its shareholders.

---

[3] As set forth in its brief supporting Motion for Preliminary Injunction at FN 2, Nevada law is controlling on corporate law issues pertaining to Intelldent given that Intelldent is a Nevada corporation. The Nevada law on this particular issue is sparse, however. Nonetheless, at least one Nevada court has cited approvingly a California case holding that a corporate director breaches his fiduciary duty where he acquires information about the business and then resigns and uses the information to develop a competing business. See *Women's Federal Sav. & Loan Ass'n of Cleveland v. Nevada Nat.*, 673 F. Supp. 401, 403 (Dist. Nev. 1983), citing *Xum Speegle, Inc. v. Fields*, 216 Cal. App. 2d 546, 31 Cal. Rpt. 104 (1963). Thus, it is reasonable to conclude that Nevada law would support the imposition of liability upon a former officer or director that utilizes or discloses the information acquired by him while employed by the corporation even after his resignation. For more explanation on this issue, please see Plaintiff's Bench Brief regarding duties of directors or officers after resignation as filed by this Court on February 14, 2013.

Mr. Fiorina made clear in his testimony that the "invention" was conceived by the Fiorinas *while they were still employees of Plastic Dental*.[4] A description of Exhibit 16 by Mr. Fiorina in his testimony would indicate that his son thought of a removable tip while shaving (T. 81), and this was in November of 2010 *while both were officers, directors and employees of the Plaintiff*. This supposedly was when the "Vari-tip" was born. (T. 81-82)

Mr. Fiorina Sr. created the CAD drawing (the same drawing as is shown on the right-hand portion of Exhibit 16) on November 17, 2010, and "shortly thereafter," he sent it to the doctors employed at Plastic Dental. (Exhibit 12; T. 55) (He labeled the new item the "P-Tip II System Vari-Tip" recalling that Plaintiff was selling at the time a product called the "P-Tip. Exhibit 12)

As also shown on Exhibit 12, Dr. Bahcall asked in a responsive email how expensive the product would be to manufacture. Mr. Fiorina responded, "We'll find out soon." (Exhibit 12) He testified that what he meant by that was he "would have to come up with drawings of some sort and go out and solicit from contractors in the machining area to see if we could even do this." (T. 56) Therefore, in January 2011, he "came up with drawings" (Exhibit 22; T. 57), and he submitted those to machine shops. (T. 57). He did this in order to answer Dr. Bahcall's question. (T. 59) He received responses from the machine shops beginning on January 17, 2011. (T. 59) The second response was received on February 7. (T. 60) The third response was received on February 9, the same day Mark Fiorina, Sr. resigned. (T. 60) Mr. Fiorina never answered Dr. Bahcall's question.

---

[4] Again, while Plaintiff will claim in the appropriate forum that the invention was conceived by Plaintiff's Dr. Kris Olsen in April 2010, it is clear that even if that is incorrect and the Fiorinas are to be credited, the conception they contend was made by them was still during a period of time when they were officers, directors and employees of Plaintiff.

While Mr. Fiorina may not have had a duty to answer Dr. Bahcall's question once he resigned, he certainly had a fiduciary obligation to <u>refrain</u> from later using in competition with Plaintiff information he had learned, conceived, gathered and/or created while an employee, officer and director of Plaintiff. Instead, he and his son shared that information with Defendant Engineered Endodontics LLC ("Engineered Endo") and caused that company to advertise and sell an embodiment of the invention. (See Ex. 16) This was in clear conflict with the fiduciary duties the Fiorinas continued to owe to Plaintiff *even after they left its employ*.

### 2. The conception of the multi-piece ultrasonic tip was confidential.

Mark Fiorina, Sr. admitted at hearing that the conception of the ultra-sonic tip in drawings was confidential. In fact, once Mark Fiorina, Sr. left Plaintiff, he requested that at least one of the machine shops holding the drawings of the multi-piece tip destroy those drawings in order to keep them out of the hands of competitors (T. 69-70) – the very reason confidential is to be protected from dissemination into the marketplace.

If this information was confidential after Mr. Fiorina left Plaintiff, it certainly was confidential before he left. As such, Mr. Fiorina owed a fiduciary obligation to protect that information from revelation to or use by others, and that obligation was one which is fiduciary in nature.[5]

### 3. The identity of the "inventor" of the product is irrelevant.

The identity of the inventor of the multi-piece endodontic tip is immaterial to whether a preliminary injunction should issue. The injunction will serve only to preserve the status quo

---

[5] Plaintiff concedes that the employment agreement (Exhibits 19 and 38) could have been better drafted to address confidentiality of technical information and drawings. However, the Fiorina Defendants were not just employees signatory to an employment agreement, but were officers and directors with fiduciary obligations more stringent than those required under a regular employment contract. And certainly fiduciaries have an obligation to protect their company's confidential information – including the subject information which Mr. Fiorina Sr. admits was confidential.

pending the outcome of this litigation – which has as its purpose the enforcement of Plaintiff's right to insist the Fiorinas refrain from breaching fiduciary duties to which, on a limited basis (*i.e.*, to the extent they would compete with Plaintiff with the use of information derived during the time they were officers/directors/employees of Plaintiff), they are still bound.[6]

The evidence is unrefuted that the multi-piece ultrasonic tip which is the subject of this litigation, whether patentable or not (and recall that Defendants contend the multi-piece tip is "not particularly patentable" T. 41), was conceived by one or more persons who were at the time officers, directors and employees of Plastic Dental. None of those persons is entitled to exploit the conception of that product in competition with the very company to which each of them owed (and on this issue still owes) a fiduciary duty.

### 4. Defendants should also be enjoined from manufacturing and/or selling the finishing file.

Mark Fiorina, Sr. assisted in the creation of what Plaintiff called an "F file" prior to his becoming an officer and director of Plaintiff. (T. 88) The F file is equivalent to the Finishing File currently manufactured by International Plastics. (T. 88) The F file continued to be sold once Plastic Endo merged into Plastic Dental (T. 99), which is when the Fiorinas became officers, directors and employees of Plastic Dental. Plastic Dental sold F tips to endodontists all over the country until International Plastics stopped manufacturing same. (T. 99)

---

[6] There are no patent issues in this litigation. Defendants have set forth an ill-conceived and ill-articulated contention regarding patent issues that may arise in the future, most probably before the United States Patent and Trademark Office ("USPTO"). To be clear, Plaintiff claims the multi-piece ultrasonic tip was invented by Dr. Kris Olsen, and that Mark Fiorina, Sr. simply assisted in perfecting the invention Dr. Olsen conceived. See *Eli Lilly & Company v. Aradigm Corp.*, 356 F.3d 1352 (Fed. Cir. 2004), holding at 1359, "…[Facts] relevant to inventorship are those showing the conception of the invention, for others may provide services in perfecting the invention conceived by another without becoming an 'inventor' by operation of law." Plaintiff's employees make no patent claims concerning use of multiple angles for a tip. As testified to by Dr. DeVengencie, single-piece tips with different angles are already and have been in the marketplace. (T. 136-137) Mr. Fiorina's idea to make the base of the two-piece instrument with multiple angles was a nice contribution to the design of the embodiment, but it was not itself the invention. The doctors have not made a claim at the USPTO as to multiple angles.

When International Plastics began making the Finishing File for sale by its subsidiary, Engineered Endo, it used the same molds utilized to manufacture the same product for Plastic Dental. (See, attached deposition of Mark Andrew Fiorina at p. 86.) International Plastics had never previously sold any product to end users, let alone selling product through use of e-commerce. Yet, as a result of receiving information from Plaintiff due to their status as shareholders (Exhibits 2 and 4), the Fiorinas learned that Plaintiff was attempting to sell the F file technology. Not to be deterred, the Fiorinas determined that they would go back into business with International Plastics and sell F tips, now labeled Finishing Files, in competition with Plastic Dental.

While International Plastics contends it owns the molds to manufacture the F file/Finishing File, that contention is immaterial. The Fiorinas, as former officers and directors of Plaintiff, have no right to violate fiduciary obligations by utilizing information they became aware of before and during the time they were shareholders and officers of Plaintiff in order to compete with Plaintiff. A preliminary injunction should be issued to stop this practice through trial.

### 5. Plaintiff has been damaged and will continue to be damaged.

Presuming the Court believes the Fiorina Defendants breached their fiduciary obligations to Plaintiff, then damages proximately follow. Plaintiff's Chief Executive Officer, Dr. DeVengencie, testified that he has tested the product being sold by Defendant Engineered Endo, and that based upon his education, training and experience it is inferior to the product which has been developed by Plaintiff. If Dr. DeVengencie's testimony is to be credited by the Court, then it is clear the sales of "Vari-tips" by Engineered Endo will taint the marketplace, causing Plaintiff's product to be less valuable. (T. 168)

Secondly, again as testified to by Dr. DeVengencie, being first to market with a new product is important to the eventual success of that product.

Third, as testified to in Dr. DeVengencie's declaration, dental companies to which Plaintiff is willing to enter negotiations for the sale of its technology have refused to conclude any discussions regarding same while Plaintiff's dispute with Defendants is ongoing. (DeVengencie Declaration, ¶ 18)

### B. Plaintiff is likely to suffer irreparable harm without an injunction.

The Fiorina Defendants' breach of the confidentiality provision of their employment agreements in and of itself, constitute irreparable harm to support the issuance of an injunction:

> Irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement or a restrictive covenant. Among other things, disclosure and use of the ex-employer's confidential information and trade secrets destroys the value of that information, permits the new employer to gain an unfair competitive advantage, and diminishes the ex-employer's competitive standing. Moreover, it is often difficult to detect illicit disclosure and loss of confidential information or to determine the monetary damages suffered thereby. [Internal citations omitted]

*ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1339 (N.D. Ill. 1990). Here, the Fiorina Defendants are doing more than simply the breach of a confidentiality provision of their employment agreements; they have breached and continue to breach fiduciary obligations to protect confidential information and to refrain from using information gained during their employment as officers and directors in competition with Plaintiff.[7] A preliminary injunction will prohibit Defendants from gaining an unfair competitive advantage, and will also stop Defendants from diminishing Plastic Dental's competitive standing.

---

[7] See also case law and argument set out in Plaintiff's original Brief in support of its Motion for Preliminary Injunction.

    **C.    The harm that Plaintiff will suffer without an injunction is greater than the harm that preliminary relief would inflict upon Defendants.**

The Fiorina Defendants receive the vast majority of their income through employment at International Plastics. Any amount of harm caused by a temporary halt of the sales by Engineered Endo of multi-piece tips will be minimal.

On the other hand, Plaintiff has as its sole business at present the effort to sell the technology at issue, as well as the F file technology, to a large dental company. If the marketplace is tainted by Defendants' sale of an inferior product into that same marketplace, and/or if Plaintiff is unable to sell its technology due to the wrongful conduct in which Defendants have engaged, Plaintiff will need to go out of business entirely. The harm to Plaintiff in the event an injunction does not issue is far greater than any harm that could be caused to the Defendants.

    **D.    The injunction is in the public interest.**

Enforcement of fiduciary obligations on the part of officers and directors, past and present, is an important policy interest over which only courts have control. When a court enforces a fiduciary or contractual obligation, such policy interests are amplified and broadcast to the larger business community. If the Court should find that the Plaintiff has a likelihood of success on the merits, then enjoining the conduct of these Defendants is not only in the interest of this Plaintiff, but is in the interest of businesses everywhere which have a need for recognition of the obligations owed to them by their officers and directors, as well as by their employees. On the other hand, there is no conceivable public interest in failing to enjoin these Defendants.

### III. THE DEFENSES RAISED BY DEFENDANTS ARE WITHOUT MERIT

#### A. Defendants have no viable unclean hands defense.

Defendants contend Plaintiff comes to this Court seeking equity with unclean hands, apparently because some of Plaintiff's owners claim the multi-piece tip as their own invention in the USPTO. Also, Defendants appear to claim that some of Plaintiff's owners acted wrongfully in failing to include the Fiorinas as inventors or co-inventors on the subject patent application. The unclean hands defense must fail, however.

First, the partial owners of the Plaintiff accused of such wrongdoing are not parties in this case. The only Plaintiff is Intelldent, and the Fiorinas, also, are owners of Intelldent as shareholders. Plaintiff itself does not claim any patent rights in the invention.[8] Plaintiff's only interest at this time is the protection of the interests of all its shareholders, including the Fiorina Defendants, from the consequences of the Fiorina Defendants' breach of their fiduciary duties to Plaintiff. Plaintiff's claims are made irrespective of the identity of the inventor. The breach by the Fiorina Defendants of their fiduciary duties is unrelated to the claim by Dr. Olsen and others that they invented the item at issue.

Here, Plaintiff had no reason to know when the Fiorina Defendants left its employ that such Defendants believed the multi-piece tip design was one the Fiorina Defendants would claim belonged exclusively to them. They made no such claim in their resignation letters or anywhere else. (Exhibits 32 and 33) When Mark Fiorina, Sr. emailed the CAD drawing to Dr. Olsen and Dr. Bahcall at Intelldent (Exhibit 12), he did not place any stamp of confidentiality on the

---

[8] Officers and directors of a closely held corporation are obligated by their fiduciary duties to assign any patent rights to the company on behalf of which the invention was conceived. If the Fiorinas are successful at the USPTO in demonstrating that they, rather than Dr. Olsen, were the inventors of the subject technology, they will have a fiduciary obligation to assign any patent rights to Plaintiff. That contention, however, is immaterial to these proceedings. Should it become material, such issue will be briefed fully at that time.

drawing or claim the drawing to be his private property. When asked by Dr. Bahcall how complicated the product would be to manufacture, instead of responding, "none of your business," Fiorina responded, "We'll find out soon." (Exhibit 12) When Mark Fiorina, Jr. took the rough prototypes to Dr. Olsen at Marquette University, he allowed Dr. Olsen to photograph them without protest. (*See* Deposition of Mark Andrew Fiorina at 65-66) Everything indicated to an objective viewer of the circumstances that the Fiorinas were acting as members of the Plastic Dental team in working together to develop a new product.

Thus, as disappointed as the doctors were when the Fiorinas left, they regrouped and tried to make the best of it for the benefit of their shareholders. Because in addition to leaving the company the Fiorinas also caused International Plastics to terminate its fulfillment services (recalling that International Plastics was the only other company that had ever manufactured product for Plastic Dental), the doctors were left to their own devices. (Exhibit 34) The doctors decided against finding another manufacturer for the moment, and they determined to transition Plastic Dental into a company that would devise ideas for products that might be desired in the endodontic industry, and then to sell that technology into the marketplace, probably to a large dental supply house. (T. 157-159; Exhibits 2 and 4) Plaintiff announced this plan in two shareholder letters sent to all shareholders (including the Fiorinas) in September 2011 and May 2012. (Exhibits 2 and 4) The intentions of Plastic Dental/Intelldent were in no way hidden from the Fiorinas. There were no unclean hands. To the extent the Fiorinas were left off the patent application made by some of the owners of Plaintiff, that issue will be addressed in another forum where the Fiorinas will maintain their alleged right to assert inventorship.

The Seventh Circuit recognizes that Illinois law "treats 'unclean hands' as an exceptional defense, one that rarely prevents the grant of relief that would otherwise be appropriate." *Polk*

*Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985), at 194. As to Illinois law on this subject, see, for example, *Ball v. McDonald's Corp.*, 97 Ill. App. 3d 495 (1st Dist. 1981); *Mascenic v. Anderson*, 53 Ill. App. 3d 971, 972 (1st Dist. 1977); *Illinois Power Company v. Latham*, 15 Ill. App. 3d 156, 168, 303 N.E.2d 448, 457 (5th Dist. 1973). The Seventh Circuit Court of Appeals in *Polk*, *supra*, found that:

> The Illinois cases are consistent with those of the federal courts, which have concluded that injunctions issue when appropriate under rules that can be announced in advance and applied even handedly…Equity is no longer granted or withheld according to the Chancellor's sensibilities and his regard for the uprightness of the parties. The injunction, like other remedies, is designed to achieve compliance with established rules, and even the wicked have a right to treatment according to the rules. An injunction that is otherwise appropriate may be withheld to achieve some competing objective…, but not to express disapproval of the Plaintiff's conduct.

In the case at bar, Plaintiff certainly did nothing to create or contribute to the current situation. Plaintiff in no fashion comes to this Court with unclean hands. The equitable relief for which it has applied is wholly appropriate.

      **B.**    **Defendants have no viable laches defense.**

The Seventh Circuit Court of Appeals has held that "the mere passage of time cannot constitute laches." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979), citing *Helene Curtis Industries, Inc. v. Church & Dwight Company, Inc.*, 560 F.2d 1325, 1334 (7th Cir. 1977). Courts in this district have held that, "[i]n order for laches to apply, the party asserting the defense must show '(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom.'" *United Airlines, Inc. v. Airline Pilots Ass'n Intern.*, 208 WL 4936847 at 42 (N.D. Ill. November 17, 2008), declining to apply defense of laches to plaintiff's claim seeking injunctive relief.

12

In evaluating the defense of laches, courts look to whether the defendant had been lulled into a false sense of security or had acted in reliance on the plaintiff's delay. *Ideal Industries*, 612 F.2d at 1025. See also *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("evidence of mere delay alone, without any explanation on [the defendant's] part on which such a delay negatively affected them, would not lessen [the plaintiff's] claim of irreparable injury").

In the case at bar, no harm has or will come because of any delay. If Defendants expended any monies preparing to attend the Chicago Dental Society trade show beginning on February 21, 2013, the Court will certainly require a bond to be posted by Plaintiff so as to compensate Engineered Endo for any such expenses in the event Plaintiff fails to prevail at trial.

Further, stopping Defendants from participating in the Chicago Dental Society trade show is but a part of the broader relief requested. The primary relief requested is a preliminary injunction prohibiting Defendants from advertising and selling the subject products prior to trial. Defendants have taken no action to their detriment in asserted reliance on Plaintiff's silence prior to January 25 other than allegedly preparing for the upcoming trade show.

Plaintiff admittedly took time to weigh its options and conduct due diligence before filing suit in this Court. Engineered Endo did not start selling the multi-piece tip until November 15, 2012. (Exhibit 16) Plaintiff met with the undersigned within a week of that (T. 131- the day before Thanksgiving), and a lawsuit was filed within two months – not significant time when considering intervention of the holidays and complexity of this matter. The decision to file suit was a huge one for a small company such as Plaintiff. The undersigned had the obligation to research all pertinent facts and law. The Complaint itself should demonstrate the time and care that was needed (and taken) in making the allegations set forth therein.

Laches is but one element for this Court to consider when weighing all of the equities. Here, it is to be recalled that this Court is being asked to protect the interests of <u>all</u> 39 shareholders – ironically including the Fiorina Defendants. If Intelldent is able to sell the technology at issue, the Fiorinas will share in the financial benefit as shareholders of the Plaintiff. In balancing the equities, it should be considered, then, that a preliminary injunction may well benefit not just the Plaintiff, but also the Fiorina Defendants as individuals.

## IV. CONCLUSION

For all of the above reasons, but specifically to maintain the staus quo pending trial, Plaintiff respectfully requests this Court to issue a temporary restraining order and/or preliminary injunction: (1) enjoining Defendants (and anyone acting on their behalf, in association with them, or in concert with them) from utilizing any information, either directly or indirectly, conceived by or obtained by the Fiorina Defendants at any time while the Fiorina Defendants were officers, directors and/or employees of Plaintiff; (2) enjoining Defendants (and anyone acting on their behalf, in association with them, or in concert with them) from advertising or putting into commerce products labeled as a "Finishing File" and/or "Vari-tip" or any product substantially similar to the same, including, but not limited to, advertising, displaying or otherwise putting such products into commerce at the Chicago Dental Society Midwinter Meeting between February 21 and February 23, 2013; and (3) that said temporary restraining order remain in effect until the Court concludes the hearing on Plaintiff's motion for preliminary injunction or, in the alternative, that said preliminary injunction, if entered at this time, remain in effect through conclusion of the trial of this matter and entry of final judgment, or until otherwise ordered by this Court.

Plaintiff contends it has established uncontroverted facts entitling it to a temporary restraining order and/or preliminary injunction absent further hearing. Should this Court determine that it must conclude the hearing before issuing a preliminary injunction, however, then Plaintiff would alternatively request issuance of a temporary restraining order restricting Defendants from engaging in conduct as set forth immediately above in Nos. (1) and (2), such temporary restraining order to last until completion of any further hearing.

Respectfully submitted,

*/s/ Richard K. Hellerman*
Richard K. Hellerman (6196915)
*rhellerman@ralaw.com*
Roetzel & Andress, LPA
20 S. Clark Street, Suite 300
Chicago, Illinois 60603
Telephone: (312) 580-1200
Facsimile: (312) 580-1201

Ronald S. Kopp (Ohio 0004950)
rkopp@ralaw.com
Roetzel & Andress, LPA
222 South Main Street
Akron, Ohio 44308
Telephone: (330) 376.2700
Facsimile: (330) 376.4577
*Attorneys for Plaintiff, Intelldent Corporation*