IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Intelldent Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 13 C 638 |
| | ) | |
| International Plastics, LLC, et al., | ) | Judge Guzman |
| | ) | |
| Defendants. | ) | Magistrate Judge Valdez |

**DEFENDANTS' POST HEARING BRIEF**

The plaintiff's motion for a temporary restraining order and a preliminary injunction sweeps broadly, seeking to enjoin the defendants from advertising and selling various dental products on multiple grounds. But at the outset of the February 15th preliminary injunction hearing, following the extensive discovery that the parties conducted on an expedited basis, the plaintiff expressly limited the scope of that motion to a request that the Court enjoin the defendants from advertising and selling a single product, the Vari-Tip, based solely on the single argument that in doing so the defendants are usurping a corporate opportunity that rightfully belongs to the plaintiff. (Tr. 2/15/13, 9:12-17). As the plaintiff's attorney explained, its modified request for injunctive relief is now "literally that narrow." (*Id.*, 9:17).[1]

Accordingly, for present purposes this is a straight-forward usurpation of corporate opportunity claim, governed by the principles set forth in *Miller v. Miller*, 301 Minn. 207, 222 N.W.2d 71 (1974). And that claim fails on the merits. The two most important reasons why this is so are, *first*, that while there is a factual dispute about the genesis of the idea for a two- or

---

[1] Although its motion also sought to enjoin defendants from selling their Finishing File product, the plaintiff did not raise that issue at the February 15th hearing. Regardless, there is no dispute that the defendants were not employees, officers, or directors of the plaintiff when they learned about its version of the Finishing File (or "F-File"), or that they twice offered to sell the plaintiff the molds that they used to manufacture the F-File for the plaintiff. Moreover, there is nothing secret or confidential about the F-File product, as it was on the market for five years before the defendants began marketing their own version of the Finishing File.

1

multi-piece tip, there is simply no dispute at all that the idea was well known to the plaintiff, and that the defendants did not begin their efforts to make and market that product until long after the plaintiff had abandoned it – had, indeed, announced that it had departed the business of making and selling dental products entirely.

*Second*, wholly apart from what the defendants did or did not do, two other competitors have already brought their own multi-piece tips to market. One of those companies, B&L Biotech, U.S.A, Inc., definitely entered the market with a multi-piece tip (which it calls the "CK Tip") *before* the defendants began selling the Vari-Tip and the other, Guilin Woodpecker Medical Instrument Co., Ltd., was either in the market with its products (the E1 and E2 Tips) at that time or close enough to it as to make the issue irrelevant. By its very nature, the idea that the plaintiff says is so valuable – the concept of a two- or multi-piece tip – loses its entire commercial value as an idea the instant it is brought to market the first time. Thus, when B&L Biotech brought its product to market, the entire supposed benefit of the corporate opportunity at issue here, the opportunity to get a leg up on the competition by being the first to market with a multi-tip, evaporated. The "idea" of a two-piece tip is now patently worthless, as it is already in the public domain.

In addition to the complete lack of substantive merit to its claim, there are two further problems with the plaintiff's request for injunctive relief. *First*, the plaintiff seeks emergency relief with respect to something that it has known about since the defendants began advertising and selling the Vari-Tip six months ago. The plaintiff concedes that for at least "a few weeks" of that time (and pretty clearly far more than that) it was "doing nothing." (Tr. 2/15/13, 166:2-3). Such conduct is more than sufficient, standing alone, to support a finding that the plaintiff waived any right to seek emergency relief, but there is now an estoppel as well because while the

plaintiff was "doing nothing" the defendants were preparing for the trade show that the plaintiff wants to stop them from attending by spending over $140,000 and widely advertising their intended presence.

*Second*, enjoining the defendants from selling the Vari-Tip will not give the plaintiff any relief. The plaintiff admits that it is not trying to sell its own version of the Vari-Tip to end-users; instead, its goal is to try to sell the concept or design for a multi-piece tip to a dental products company for manufacture. However, its product is not patented and, as we noted earlier, the multi-piece tip concept is already out in the marketplace. Thus, even if this court were to enjoin the defendants from selling the Vari-Tip, nothing would stop one or a hundred other companies from attempting to manufacture and sell their own versions of a multi-piece tip.

## ARGUMENT

"A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and 3) it will suffer irreparable harm if the injunction is not granted." *Ty, Inc., v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *Chicagoland Aviation, LLC v. Todd*, 2012 WL 5949358, *2 (N.D. Ill.). If the plaintiff can meet these three conditions, then the court must weigh "the possibility of irreparable harm to the non-moving party if the injunction is issued, balancing this harm against the irreparable harm the moving party will suffer if the relief is denied." *Chicagoland*, 2012 WL 5949358 at *2. "The Court should also consider the public interest in granting or denying the injunction." *Id.*[2]

---

[2] The court granted the plaintiff a hearing on its combined TRO and preliminary injunction motion on an emergency basis because it seeks to bar the defendants from attending a trade show that begins on February 21, 2013. Due to time constraints, the defendants were unable to call all of their witnesses or present all of their evidence at the February 15th hearing. Thus, if the court declines to deny the plaintiff's motion in total, the defendants request that it limit its relief to a temporary restraining order and that it stay ruling on the request for a preliminary injunction until a full hearing can be held on that issue.

Here, the plaintiff is virtually certain to fail on the merits, but even if it did succeed it has an adequate remedy at law, so no irreparable harm will result from denial of an injunction, while its entry would do immediate and irreparable harm to the defendants' business. Accordingly, the plaintiff's motion must be denied.

**1.     The plaintiff cannot succeed on the merits**

While the plaintiff's complaint contains multiple counts, for present purposes it has limited its claim to one of alleged usurpation of a corporate opportunity. (Tr. 2/15/13, 9:12-17). The most comprehensive articulation of the law on this issue is the Minnesota Supreme Court's decision in *Miller v. Miller, supra*.[3]

The *Miller* court synthesized the case law into a two-part test. The first step is to answer the "threshold question" of "whether a business opportunity presented is also a 'corporate' opportunity, *i.e.*, whether the business opportunity is of sufficient importance and is so closely related to the existing or prospective activity of the corporation as to warrant judicial sanctions against its personal acquisition by a managing officer or director of the corporation." *Miller*, 222 N.W.2d at 81. If the corporation does present sufficient evidence of a corporate opportunity, the court moves to the second step of the process, because even if "the opportunity is found to be a corporate one, liability should not be imposed upon the acquiring officer if the evidence establishes that his acquisition [of that opportunity] did not violate his fiduciary duties of loyalty, good faith, and fair dealing toward the corporation." *Miller*, 222 N.W.2d at 81. This step "involves close scrutiny of the equitable considerations existing prior to, at the time of, and following the officer's acquisition [and] will necessarily depend upon a consideration of all the facts and circumstances of each case considered in light of those factors which control the

---

[3] Because the plaintiff is a Nevada corporation, we agree that its law governs this issue. As there is little Nevada law on the issue, the parties appear to agree that the Court must look to cases decided by other courts.

4

decision that the opportunity was in fact a corporate opportunity." *Id.*

The corporate opportunity that the plaintiffs allege the defendants usurped here was the concept of a two- (or multi-) piece ultrasonic tip for use in endodontic applications. This concept was concieved while Mark Arthur and Mark Andrew Fiorina were employed full-time at International Plastics, LLC and were also officers and directors of Dental Plastics (now Intelldent, the plaintiff). After the Fiorinas resigned from Dental Plastics, they refined the two-piece tip concept into the Vari-Tip product that the defendants now offer for sale. The plaintiff claims the defendants learned of that concept only through the Fiorinas' work for Dental Plastics, and that they (and their new company) breached their fiduciary duties by usurping what was rightly the plaintiff's corporate opportunity to develop and market that concept.

The plaintiff is highly unlikely to succeed on the merits of this claim both because the Fiorinas developed the two-piece tip concept in their capacity as full-time employees of International Plastics and because it is undisputed that the concept was in any event offered to the plaintiff and that the defendants developed and marketed their version of the two-piece tip only after the plaintiff abandoned not just that tip but its direct sales operations altogether (and another company had already entered the market with a two-piece tip).

### A. The corporate opportunity belonged to International Plastics because the Fiorinas developed the two-piece tip idea in their capacity as its employees.

The parties dispute who came up with the idea of a two-piece tip. The plaintiff's counsel argued at the hearing that it doesn't matter whether Dr. Kris Olsen or the Fiorinas devised the concept because they were all employees and officers of Plastic Dental at the time, so the corporate opportunity belonged to the plaintiff. However, it does matter that the Fiorinas designed the two-piece tip concept if they did so for a company *other* than Plastic Dental. And here, the weight of the evidence supports the conclusion that the Fiorinas designed the two-piece

5

tip concept—which they eventually developed into the Vari-Tip product—as employees of International Plastics, not as Plastic Dental employees:

- Under section 1.02 of their contracts with Plastic Dental—contracts under which they earned (but were never paid) the staggering sum of $1 per year—the Fiorinas were "expected" to maintain other full-time employment during the term of the contracts (Ex. 19, p.2, § 1.02; Ex. 38, p.2, § 1.02). Thus, both Mark Arthur Fiorina and Mark Andrew Fiorina were employed full-time at International Plastics, LLC, during that entire period, and Plastic Dental knew that their full-time job was at International Plastics. (Tr. 2/15/13, 89:20-25, 90:1-2; Mark Andrew Fiorina Affidavit, ¶¶7, 10).[4]

- The Fiorinas' duties at International Plastics included designing and manufacturing products. (Tr. 2/15/13, 90:3-4, Mark Andrew Fiorina Affidavit, ¶¶8, 9).

- The Fiorinas' duties for Plastic Dental, described in section 1.02 of their contracts, did not include developing, inventing or designing products. (Ex. 19, p.2, §1.02; Ex. 38, p.2 §1.02). Mark Andrew Fiorina's role at Plastic Dental was limited to supporting the marketing of existing Plastic Dental products at trade shows. (Mark Andrew Fiorina Affidavit, ¶11). Mark Arthur Fiorina's role at Plastic Dental was limited to consulting on the feasibility of manufacturing products – in particular, whether certain metal endodontist tools could be made out of plastic. (Tr. 2/15/13, 89:8-12, Mark Andrew Fiorina Affidavit, ¶12; Ex. 2).

- Mark Andrew Fiorina first devised the idea of a swiveling separable ultra-sonic tip while he was shaving with a disposable head swiveling razor. (Mark Andrew Fiorina Affidavit, ¶13). Mark Arthur Fiorina discovered that Mark Andrew's idea of a swiveling tip would not function, but the idea led him to the more workable concept of a two-piece ultrasonic tip with a separable end piece and an angled base. *Id.*, ¶14.

- Mark Arthur Fiorina designed a two-piece ultrasonic metal tip and prepared computer automated design ("CAD") drawings of the concept on behalf of International Plastics and as an International Plastics' employee. (Tr. 2/15/13, 63:9-16; Ex. 12; Mark Arthur Fiorina Dep., p.41). He then e-mailed his concept and the drawings to Drs. Kris Olsen and Jim Bahcall under his International Plastics' signature and from his International Plastics' email account. (Ex. 12).

- Dr. Olsen responded to Mark Arthur's e-mail by describing his concept as a "great idea." (Ex. 13)

- When the Fiorinas sent manufacturers their concept drawings of the tips seeking bids on the components, they prepared the bid requests on International Plastics'

---

[4] Both parties are relying on the book of joint exhibits that was tendered to the Court at the hearing. The defendants have submitted with this brief additional deposition testimony, along with an affidavit (and attached exhibits) from Mark Andrew Fiorina.

forms. (Ex. 22). Mark Andrew Fiorina requested the quotes in his capacity as an International Plastics' employee, and all the drawings included disclaimers that "all information and data contained on this document is the confidential property of International Plastics LLC and may not be used without expressed permission of International Plastics LLC." (Mark Andrew Fiorina Affidavit, ¶16).

Thus, the evidence demonstrates that any corporate opportunity related to a multi-piece ultrasonic tip belonged to International Plastics, for whom it was designed.

### B. The corporate opportunity was offered to the plaintiff and it abandoned that opportunity.

Regardless of whether it belonged to International Plastics or Plastic Dental, it is undisputed that the corporate opportunity was offered to the plaintiff when Mark Arthur Fiorina e-mailed the two-piece ultrasonic tip concept and drawings to Drs. Olsen and Bahcall on November 17, 2010. (Ex. 12; Ex. 13). This is a critical, and in this case dispositive, fact. *Miller*, 222 N.W.2d at 82. Indeed, the American Law Institute's principles of corporate governance essentially make whether or not an opportunity was offered to the company the touchstone of liability for usurpation of a corporate opportunity, and some courts have adopted this approach as their test. *Northeast Harbor Golf Club, Inc. v. Harris*, 661 A.2d 1146, 1150-51 (Me. 1995).

The plaintiff then unequivocally abandoned that opportunity. In September of 2011— eleven months before the defendants began selling the Vari-Tip—Plastic Dental announced that it was discontinuing retail sales of dental products altogether. (Ex. 2; Ex. 8). It never manufactured a multi-piece ultrasonic tip for sale. (DeVengencie Dep. at 105).

This suffices to defeat the plaintiff's claim. *See, e.g., Weil v. Express Container Corp.*, 360 N.J.Super. 599, 824 A.2d 174, 184 (2003) ("the fact that the [corporate opportunity] was abandoned is fatal . . . for it demonstrates conclusively that neither Berson nor Wilson Fidelco deprived her of any corporate opportunity."). It is not necessary for the defendants to show that the corporation expressly rejected or refused the opportunity; it is enough that its conduct

7

demonstrates that it declined to pursue the opportunity. *Racine v. Weisflog*, 165 Wis.2d 184, 477 N.W.2d 326, 333 (Wis.App. 1991); *Kline v. Knight*, 135 Md.App.732, 2000 WL 33799690 at *45; *Northeast Harbor Golf Club, Inc., supra*.

At the hearing, Dr. DeVengencie claimed that the plaintiff is now trying to sell its "concept" or "design" for a multi-piece ultrasonic tip to dental sales and manufacturing companies (Tr. 2/15/13, 105, 171). To the extent that its hope is to sell the "idea" for a two- or multi-piece tip, its effort is doomed to failure, as that concept is already in the public domain. To the extent that it believes that it has a better mousetrap—a particularly well-designed multi-piece tip that is better than those being made by the defendants or the other companies competing in the marketplace—it remains free to do so, and nothing the defendants are doing interferes with or impedes that effort.

And the possibility that the plaintiff might someday attempt to re-enter the market as a manufacturer is irrelevant. "[A] corporate opportunity exists where the proposed activity is reasonably incident to the corporations *present or prospective* business and one *in which the corporation has the capacity to engage.*" *Goldberg v. Michael*, 328 Ill.App.3d 593, 600 (2002). In 2012, the plaintiff simply did not have the resources to pursue the multi-piece ultrasonic tip opportunity as it was severely short on operating cash (Ex. 6, balance sheet showing $56,123 in cash assets) and, as of today, it has no capacity to manufacture products to sell to end users. (Ex. 2; Ex. 8). Dr. Olsen admits that the plaintiff did not have the money to restart manufacture of even its existing dental products. (Olsen Dep., 24:11-14). In the 13 months that it has supposedly been marketing the multi-piece tip concept, the plaintiff has not entered into any sales or licensing agreements for the product. (DeVengencie Dep. at 118-19). Indeed, the plaintiff, which claims to be in the business of "selling technology to companies that would bring to market the

product" has not successfully sold any product at all. (Bahcall Dep. 42:13-19).

### C. There was no corporate opportunity to usurp because multi-piece ultra-sonic tips were already on the market.

The plaintiff has also suggested that the defendants improperly made use of information that the Fiorinas acquired while they were its directors, but even their own cases recognize a critical distinction among the kinds of information at issue, and attribute far more significance to the use of confidential information. *See, e.g., Xum Speegle, Inc. v. Fields*, 216 Cal.App.2d 546, 31 Cal.Rptr. 104, 105 (1963); *Veco Corp. v. Babcock*, 243 Ill.App.3d 153, 163 (1993); *Comedy Cottage v. Berk*, 145 Ill.App.3d 355, 360-61 (1986). The court should not overlook the significance of this distinction, because the information at issue here simply was not confidential.

The concept of a two- or multi-piece tip was already in the ultrasonic endodontic tip market when the defendants entered that market in 2012. (Mark Andrew Fiorina Affidavit, ¶¶20-24). When the defendants decided to enter the market, Mark Andrew Fiorina did research to learn what comparable products other dental companies had on the market and what they were charging. *Id.* Using a simple Google search, he learned that multi-piece ultrasonic tips with permanent bases and disposable tips for the purpose of "troughing" in endodontic applications—precisely the purpose of the Vari-Tip—were already on the market. *Id*. He found that a large dental product company, B&L Biotech USA, Inc. was already selling a version of a multi-piece ultrasonic endodontic tip called the CK Tip. Later, he learned that a second company, Guilin Woodpecker Medical Instrument Co., Ltd., began selling two such products (the E1 and E2 Tips) at or about the same time the defendants entered the market. *Id*. Both B&L Biotech's CK Tip and Guilin Woodpecker's E1 and E2 Tips are currently available for sale. *Id.* Even if one assumes for the sake of argument that the idea for a two- or multi-piece tip was proprietary confidential information belonging to the plaintiff, that confidentiality was permanently destroyed—through

9

no fault of these defendants—the minute these other companies began marketing their products.

Moreover, the confidentiality provisions in the Fiorinas' contracts with Plastic Dental cannot be read to cover this information. (Ex. 19, p3 § 2.01; Ex. 38, p3 § 2.01). Confidentiality provisions, like non-compete clauses, are in restraint of trade and must therefore be strictly construed and "carefully scrutinized by courts." *Archer Daniels Midland v. Whitacre*, 60 F.Supp.2d 819, 825 (C.D. Ill. 1999); *Tax Track Systems Corp v. New Investor World, Inc.*, 2005 WL 936638 at *5 (N.D. Ill); *Interim Health Care of N. Ill., Inc v. Interim Health Care, Inc*. 225 F.3d 876, 879 (7th Cir. 2000). The Fiorinas' contracts provide that:

> the Holding Company has developed and uses various proprietary and confidential practices and methods of conducting business, information and data, and computer software and databases. In particular, Executive acknowledges that the Holding Company has developed among other things, specialized business methods, techniques, plans and know-how; budgets, financing and accounting techniques and projections; advertising, proposals, applications, marketing materials and concepts; customer files and other non-public information regarding customers; methods for developing and maintaining business relationships with customers and prospective customers; customer and prospect lists; copies of previous insurance policies and renewal dates; procedure manuals,; and employee training and review programs and techniques. (Ex. 19, p.3; Ex. 38, p3).

This vague definition does not cover engineering, design, and invention work, and it certainly does not cover work that the Fiorinas performed for a different company.

Nor did the defendants rely on any concepts that Dr. Olsen devised. His concept was to add a brass bushing onto the plastic base of Plastic Dental's P Tip product and to shorten the amount of plastic along the snorkel. (Olsen Dep. at 51). While he claims to have also conceived the idea that these pieces could be separable (*id.* at 53), the simple and undeniable fact is that he is wrong: the multi-piece concept was already incorporated into tips that were being sold on the open market. Moreover, Dr. DeVengencie admits that the defendants' Vari-Tip is materially different from the multi-piece ultrasonic tip that the plaintiff claims to be marketing

10

(DeVengencie Dep. at 99-100).[5]

### D. Nothing in the Fiorinas' contracts prevents the defendants from competing with Plastic Dental.

Nothing in the Fiorinas' contracts prevents the defendants from competing with Plastic Dental. Section 1.02 of those contracts provides that during their term the Fiorinas may not engage in any business competitive with Plastic Dental, but that provision does not contain any "tail" preventing competition after the Fiorinas resigned. (Ex. 19, p.2, §1.02; Ex. 38, p.2, §1.02). There is no evidence that the Fiorinas engaged in any competitive activity before April 11, 2012 (a year after they resigned from Plastic Dental) when they made new drawings of a multi-piece ultrasonic tip that became the Vari-Tip. (Tr. 2/15/13, 106:9-14; Ex. 25; Mark Arthur Fiorina Dep. at 35-36).

Section 2.02 of the contracts does bar the Fiorinas from soliciting Plastic Dental's customers and prospective customers for two years after the termination of the contracts. (Ex. 19, p.4 §2.02; Ex. 38, p.4 §2.02). However, there is no dispute that Plastic Dental abandoned the retail dental product market and no longer sells dental products directly to customers. (Ex. 2; Ex. 8; DeVengencie Dep. at 79-80). Thus, Plastic Dental does not have any "customers" that the defendants could be accused of soliciting.

### 2. The plaintiff has an adequate remedy at law.

Even assuming that the plaintiff prevailed on the merits, it would have an adequate remedy at law for the harm it has suffered. If the defendants are found to have usurped the plaintiff's corporate opportunity, and the money that they earned from selling the Vari-Tip products ought to have gone to the plaintiff, that amount is easily calculable and there is no

---

[5] The U.S. patent office denied the patent application submitted by Drs. Olsen, Bahcall, and DeVengencie because their design was covered by prior patents and any differences would have been obvious to one skilled in the art. (Ex. 15, p.8 of "Detailed Action").

11

reason that those profits cannot be handed over.

The plaintiff claims that because this case involves a "brand new product," proving damages in the form of lost profits would be extremely difficult. (2/15/13 Tr. 21:18-23). But that is nonsense. To the extent that the "new product" was the *concept* of a multi-piece tip, there are no damages because that concept was already in the public domain before the defendants began selling the Vari-Tip. (Mark Andrew Fiorina Affidavit, ¶¶20-24). And to the extent that the plaintiffs' claim is that they are owed part of the profits from the Vari-Tip, the fact that the product is a new one doesn't have the slightest impact on the ability to calculate the profits that it has generated.

**3.     The plaintiff is not being irreparably harmed.**

The plaintiff claimed that it is being irreparably harmed by the defendants' sale of the Vari-Tip because: 1) it is an inferior product that will "tarnish the market" for multi-piece ultrasonic tips; 2) the plaintiff cannot sell its tip concept/design to a dental manufacturer while its ownership is in dispute; 3) the Vari-Tip will cause confusion in the market; and 4) the "first to market wins."

There is no evidence that the Vari-Tip is tainting the multi-piece ultrasonic tip market. To the contrary, the defendants have received positive feedback from customers of the Vari-Tip. (Mark Andrew Fiorina Affidavit, ¶¶26-28). In fact, 44% percent of their Vari-Tip sales have been re-orders from existing customers. (*Id.*, ¶35). The only evidence plaintiff's presented of danger to the market from the sale of the Vari-Tip was Dr. DeVengencie's self-serving testimony that it is an inferior product. (2/15/13 Tr., 167-69). Moreover, the Vari-Tip is just one of several multi-piece ultrasonic tips in the market today; if it is a poor product, it will no doubt lose market share to these alternative products. If the plaintiff is correct that its own concept for a multi-piece ultrasonic tip is superior to the Vari-Tip and the other products out there, it is free to bring that

product to market.

The claim that some vague and unspecified "ownership dispute" is hampering the defendants' efforts to market whatever it is that they are trying to market is both illogical and unsupported by any evidence. The defendants are not seeking to enjoin the plaintiff from doing anything, nor would there be any point to attempting to claim "ownership" of an idea that is in the public domain. To the extent that the plaintiff is attempting to market what it believes is a better mousetrap, nothing the defendants are doing inhibits those efforts.

The defendants' sale of the Vari-Tip cannot cause confusion in the market because the plaintiff is not in the market. It abandoned the retail market in the summer of 2011, and it does not sell (or intend to sell) products to end users.

As for the claim that the plaintiff is being harmed because "first to market wins," the only response necessary is that, if that was true, both the plaintiff and defendants would already have lost the game to B&L Biotech, which has had a multi-piece ultrasonic tip for sale in the market since at least 2011. (Mark Andrew Fiorina Affidavit, ¶21). But of course it is not true, or the plaintiff would have no reason to seek to enjoin the defendants.

Finally, Dr. DeVengencie admits that the plaintiff is not being irreparably harmed. He acknowledged at the hearing that despite the defendants' sales of Vari-Tip, "things are still smooth" with the plaintiff's attempts to sell its own multi-piece ultrasonic tip to a manufacturing company. (2/15/13 Tr., 205:19-21). Thus, by its own admission, the plaintiff is not being harmed.

**4.     The defendants will be irreparably harmed by an injunction and the balancing of harms supports its denial.**

The harm to the defendants from an injunction would be immediate and irreparable. They have been diligently advertising and selling their Vari-Tip since August, and building a

reputation that will be irreparably tarnished if they suddenly withdraw from the market.

Because the Vari-Tip has a permanent base with disposable tips, the defendants' customers need to replace those tips regularly. (Mark Andrew Fiorina Affidavit, ¶37). If the defendants are suddenly unable to fulfill these orders due to an injunction, their customers will no doubt feel that they have been tricked into buying expensive base components that they can no longer use. This will irreparably damage the defendants' reputation in the industry, an injury they would likely never be able to redress. *Id*. They will lose all their present customers, good will, and the effects of their advertising, and will get a reputation for being unreliable. As their product is based on repeat business selling the replaceable part of the tips, a reputation for unreliability will tank them in the industry. *Id*.

Likewise, the defendants have invested $140,000 in expenses for the trade show beginning on February 21, 2013. (Mark Andrew Fiorina Affidavit, ¶¶28-33). They have also represented in all their advertising that they will be in attendance. *Id*. If the Court enjoins the defendants from attending the trade show they will not only lose that investment, they will be perceived as having failed to keep their advertised promises. The plaintiff, on the other hand, is not selling any products, and will not be harmed by the wait for a full trial on the merits.

5. **Granting the injunction will harm the public interest.**

Granting the plaintiff's injunction will also harm the public interest. The Vari-Tip product is cheaper and more effective for root canal therapy than many existing tips on the market. (Bahcall Dep. at 88-89). Endodontists rely on the defendants to provide these tips, which are an inexpensive disposable end piece fitted onto a relatively expensive base. (Mark Andrew Fiorina Affidavit, ¶37). If the defendants are enjoined from selling that product, their customers will not be able to replace the inexpensive end pieces that fit in the base of the tip and will be

14

forced to replace the entire product at great cost. *Id*.

The plaintiff argues that the public interest has an interest in sanctioning a breach of fiduciary duty, but that interest can be fully and completely accommodated—assuming, of course, that there *is* a breach—by imposing a constructive trust on the breaching party's profits.

**6.     The equities support denial of the plaintiff's motion.**

    **A.     Equity will not assist those with unclean hands.**

Equity requires that the plaintiff approach the Court with clean hands and the plaintiff has arrived with a very spotty record, to say the least.

After the Fiorinas resigned from Plastic Dental, its principals and executives, Drs. DeVengencie, Orsel, and Bahcall stole Mark Arthur's drawings and concepts as their own. There is no dispute that the doctors filed a patent application, listing themselves as inventors of the two-piece ultrasonic tip invention without giving the Fiorinas any credit, despite the fact that the application attached Mark Arthur's CAD drawings, contained his description of the concept almost word-for-word, and included a photo that Dr. Orsel took of the prototype that was created by the Fiorinas. (Compare Ex. 14 to Ex. 12).

    **B.     Plaintiff's motion is barred by waiver and estoppel.**

The plaintiff has known about the defendants' sales of the Vari-Tip since August of 2012. (Bahcall Dep. at 13-14). It has known that defendants would be attending the trade show at issue since November of 2012. (Bahcall dep. 15:14:20; Exhibit 5 to Complaint). Yet it waited until January 28, 2013, to file this lawsuit. During that time, the defendants built a loyal customer base and invested $140,000 in advertising and preparing for the trade show. Six months after the fact, the plaintiff now seeks "emergency" injunctive relief. That is far, far too late. Both waiver and estoppel bar injunctive relief here.

**WHEREFORE,** the defendants respectfully request that the Court deny the plaintiff's motion for a preliminary injunction and a temporary restraining order.

Dated: February 19, 2013

Respectfully submitted,

By: /s/ Elizabeth Richert
One of the attorneys for the defendants

Kenneth P. Ross
Eugene J. Schiltz
Elizabeth R. Richert
COLEMAN LAW FIRM
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601
Telephone: 312-444-1000
ARDC#: 06181363

## CERTIFICATE OF FILING AND SERVICE

I, Elizabeth E. Richert, an attorney, hereby certify that on February 19, 2013, I caused the foregoing **DEFENDANTS' POST HEARING BRIEF** to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, using the Court's CM/ECF system, which will automatically send notification of filing to all counsel of record.

    /s/ Elizabeth E. Richert