IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTELLDENT CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 13 cv 638 |
| | ) | |
| INTERNATIONAL PLASTICS LLC, | ) | Judge Ronald A. Guzmán |
| *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Intelldent Corporation ("Intelldent"), moves this Court, pursuant to Federal Rule of Civil Procedure 65, for entry of a Temporary Restraining Order against Defendants International Plastics LLC ("International Plastics"), Mark Arthur Fiorina, Mark Andrew Fiorina (Mark Arthur Fiorina and Mark Andrew Fiorina are collectively referred to herein as the "Fiorina Defendants") and Engineered Endodontics ("Engineered Endo") (International Plastics, the Fiorina Defendants and Engineered Endo are collectively referred to herein as "Defendants"), enjoining Defendants (and anyone acting on their behalf, in association with them or in concert with them) from utilizing any information, either directly or indirectly, obtained by the Fiorina Defendants at any time while the Fiorina Defendants were officers, directors and/or employees of lntelldent, and ordering that all such information be returned to lntelldent; enjoining Defendants (and anyone acting on their behalf, in association with them or in concert with them) from advertising or putting into commerce products labeled by Engineering Endo as "Finishing File" and/or "Vari-Tip," or any products substantially similar to the same including, but not limited to, advertising, displaying or otherwise putting such products into commerce at the Chicago Dental Society Mid-winter Meeting between February 21 and February 23, 2013; and directing Defendants (and anyone acting on their behalf, in association with them or in concert with them) to immediately return to Intelldent all molds owned by lntelldent used for the purpose of making products for Intelldent or its affiliates.

This action arises out of a business arrangement between the Fiorina Defendants and Intelldent. Intelldent claims it is entitled to a temporary restraining order to preclude the Fiorina Defendants from conspiring with two companies under their control - Defendants International Plastics and Engineered Endo - to usurp Intelldent's corporate opportunities and misappropriate Intelldent's confidential and proprietary information.

Intelldent, formerly known as Plastic Dental Corporation ("Plastic Dental"), is a Nevada corporation that was formed on or about July 7, 2008. The principals of Intelldent are Dr. James Bahcall ("Bahcall"), Dr. Kris Olsen ("Olsen"), and Dr. James De Vengencie ("De Vengencie"), each of whom is a licensed endodontist and dentist. In May of 2008 Plastic Endo LLC ("Plastic Endo") and another entity, Plastic Dental, merged and subsequently became known as Intelldent. At all times Intelldent and its predecessors have been in the business of inventing, developing and bringing to market products for the use of dentists and endodontists for the benefit of their patients.

Defendant Mark Arthur Fiorina was an officer and director of Intelldent from May 7, 2008 through his resignation on February 9, 2011. (Tr. 51.) In addition, since on or before May 7, 2008, he has been a shareholder of Intelldent. Defendant Mark Andrew Fiorina, who is the son of Mark Arthur Fiorina, was an officer and director of Intelldent from May 7, 2008 through his resignation on April 4, 2011. (*Id.*) Since on or before May 7, 2008, he has been a shareholder of Intelldent. The Fiorina Defendants also entered into separate employment agreements with Intelldent which bound the parties for a period of five years. The employment agreements contained provisions relating to the Fiorina Defendants' duties and responsibilities:

> **1.02 Duties and Responsibilities:** Executive shall report and be responsible to and be subject to the direction of the Holding Company's Board of Directors. During Executive's employment by the Holding Company, Executive shall not engage in any business activity competitive with the Business of the Holding Company or its subsidiaries. Executive shall adhere to the highest fiduciary standards, ethical practices, and standards of care and competence[:]
> (a) to generally promote, develop, and expand the Business of the Holding Company; . . .
> (d) to do those tasks necessary to maintain the Holding Company; . . . .
> (k) [to] evaluate[] and recommend[] business partnering and M&A opportunities; Executive shall not be required to devote his full-time and energies to the Holding Company and it is expected that he will maintain other full time employment.

The agreements also contained an article entitled "Confidentiality, Noncompetition, and Nondisclosure," which states:

> Executive acknowledges and agrees that the Holding Company has developed and uses various proprietary and confidential practices and methods of conducting business, information and data, and computer software and databases. In particular, Executive acknowledges that the Holding Company has developed among other things, specialized business methods, techniques, plans and know-how; budgets, financing and accounting techniques and projections; advertising, proposals, applications, marketing materials and concepts; customer files and other non-public information regarding customers; methods for developing and maintaining business relationships with customers and prospective customers; customer and prospect lists; . . . The foregoing information, software, documents,

practices, and methods of conducting business shall hereinafter be referred to as the "Confidential Information." Executive agrees that the Confidential Information is a trade secret of the Holding Company which shall remain the sole property of the Holding Company notwithstanding that Executive, as an employee of the Holding Company, may participate in the development of the Confidential Information. Except as otherwise provided in this Agreement, during the term of this agreement and at all times thereafter Executive shall not disclose any Confidential Information to any person or entity for any reason or purpose whatsoever, nor shall Executive make use of any Confidential Information for Executive's own benefit or for the benefit of any other person or entity.

The employment agreement also contained a clause addressing equitable relief with regards to the misuse of confidential information:

**2.04 Right to Injunctive and Equitable Relief**. Executive's obligations not to disclose or use the Confidential Information and to refrain from the solicitations and employment described in this Article are of a special and unique character which gives them a peculiar value. The Holding Company cannot be reasonably or adequately compensated in damages in an action at law in the event Executive breaches such obligations. Therefore, Executive expressly agrees that the Holding Company shall be entitled to injunctive and other equitable relief without bond or other security in the event of such breach in addition to any other rights or remedies which the Holding Company may possess. Furthermore, the obligations of Executive and the rights and remedies of the Holding Company under this Article are cumulative and in addition to, and not in lieu of, any obligations, rights, or remedies created by applicable law relating to misappropriation or theft of trade secrets or confidential information.

Mark Fiorina, Sr., an engineer by training, was recognized to have "extraordinary and unique skill, talent and ability to conduct and promote the business of Plastic Dental." (Ex. 38, Employment Agreement 1.) He was brought into Plastic Dental as the manufacturing and engineering employee on the team. (Tr. 115.) No one else on the five-person team had that capability. (Tr. 114-15.) In that capacity, his job was to use his skill to "promote, develop and expand the business" of Plastic Dental. (Ex. 38, Employment Agreement 2.) The other officers and directors (with the exception of Fiorina Jr.) were dentists and orthodontists whose skill and contributions were in their knowledge of dental procedures, the tools of the trade and the needs of dentists. (Tr. 128.) Originally, the aim of Intelldent was to create dental tools using polymers whenever possible, which would be cheaper to replace than the metal tools in use at the time. The company's first such invention was the P-Tip line of ultrasonic tips. This product was designed to be a disposable, one-time-use tip, was very inexpensive for the dentist and would work as well or almost as well as a much more expensive metal tool currently in use. The hope was that the savings in cost would make up for the fact that the tool did not work as well as traditional metal ultrasonic tips in use. (Ex. 11; Tr. 130, 139.) This product met with some, but limited, success in the market. It had several problems, the most important being that it simply

did not function very well as a drill. It lacked sufficient drilling power and sometimes would melt if the power was turned up too much. In addition, it was not perceived as being very aesthetic. (Tr. 133.) So, the company was still looking for a better way to penetrate the market. (Tr. 140.)

In April 2010, Dr. Bahcall, Dr. Olsen, Dr. De Vengencie and Mark Andrew Fiorina (Fiorina Junior) attended the annual meeting of the American Association of Endodontists in San Diego, California on behalf of Plastic Dental, all at the company's expense. The company exhibited a booth at the exhibit hall of that show. During the show, the five directors/officers of Plastic Dental had discussions regarding possible resolutions to the problems with the P-Tip line. At one such conversation, in the lobby of the hotel, Dr. Kris Olsen first came up with the idea of having a removable tip at the end of the P-Tip drill. The concept was accepted as a good one that should be looked into because: (1) it would be different, not just another one of many such tips on the market and (2) it would save money because the tips in in general use at the time broke often and were expensive to replace. If only the very end or extreme tip of the tool had to be replaced, this could constitute a significant savings for the practicing dentist. According to Dr. DeVengencie, there was nothing like that on the market at the time. From this testimony, which is substantially uncontradicted, it is clear that the idea to develop an ultrasonic drill with replaceable tips to reduce cost and remedy the performance shortcomings of the company's P-Tip product was conceived during a discussion between officers, directors and employees of Plastic Dental/Intelldent during a trade show that all were attending at the expense of the company and for the purpose of advancing the company's products. It was conceived by Dr. Olsen and the idea was first communicated by him to Mark Fiorina Jr. during the course of his employment with and his activities as an officer and director of the company. Clearly the business opportunity that this product idea represented belongs to Plastic Dental/Intelldent, not to any individual.

The fact that, at a later point in time, Mark Fiorina Jr. devised an efficient method by which to attach the replaceable tips to the base of the ultrasonic tip/drill does not change this conclusion in any way. As an employee, shareholder, director and officer of the corporation, Mark Fiorina Jr.'s only rights with respect to a business opportunity that belonged to the corporation was to advance that opportunity on behalf of and for the benefit of the corporation, not for his own use or for the benefit of another. Indeed, the rest of the testimony supports this conclusion. All five officers and directors were excited about developing this idea into an actual product and would talk about it when they worked together. (Tr. 143.)

Subsequently, the Fiorinas developed a CAD drawing and in November or December a prototype of the ultrasonic vibrating tool with replaceable tips. Mark Fiorina Jr. took these prototypes to Dr. Olsen at Marquette University. Clearly, the Fiorinas at this point were working in conjunction with the principals of Plastic Dental/Intelldent on a company project, the development of the ultrasonic device with replaceable tips. Dr. Olsen took a photograph of the prototypes and sent it to his partners. (Tr. 68, 69.) On November 17, 2010, by e-mail, Dr. Bahcall asked Fiorina Sr. how expensive or complicated it would be to manufacture the prototype, and Fiorina Senior answered "we will find out soon." (Tr. 112.) So, clearly, Fiorina

Sr. at this time was also involved in collaborating with his employer and his fellow officers and directors in developing this business opportunity as a product for Plastic Dental/Intelldent.

Interestingly, however, Fiorina Sr. did not share the pricing information he discovered with Intelldent before he resigned and proceeded to develop the product on his own. Instead, he called the potential manufacturer from whom he had received pricing information and directed it to destroy the pictures he sent and not tell anyone about his inquiries. At the hearing, Fiorina Sr. explained that he failed to share the information because it was just a raw production cost and did not include the cost of assembly, packaging and so on. This type of information, he stated, he would never share. At any rate, Fiorina Sr. resigned without ever answering Dr. Bahcall's question regarding the cost and feasibility of manufacturing the new product. Dr. DeVengencie and his associate, however, actually tested the prototype sent to them by Mark Fiorina on behalf of Plastic Dental/Intelldent.

On February 9, 2011 Fiorina Sr. submitted his letter of resignation as an employee, board member and officer of Plastic Dental/Intelldent, though he apparently retained his status as a shareholder. Then on April 27, 2011 Plastic Dental/Intelldent received a letter from International Plastics (a company of which both Fiorinas were officers and directors) informing it that International Plastics would no longer be fulfilling Plastic Dental's orders for its plastic products. Shortly after that Fiorina Jr. resigned from Intelldent.

During the evidentiary hearing, Fiorina Senior testified that he was not willing to speculate as to whether he would have designed the variable tip product solely for International Plastics. However, he admitted that International Plastics was not in the business of manufacturing metal parts or products, only plastic. It is abundantly clear that the concept of an interchangeable tipped ultrasonic vibrating dental tool is not an idea that the Fiorinas conceived or would have conceived on their own. Rather, this type of product, and the idea itself. is something that was squarely within the business purpose of Plastic Dental/Intelldent, was conceived by a director of Plastic Dental/Intelldent, was shared with Fiorina Jr. during a discussion regarding possible new business opportunities for Plastic Dental/Intelldent while at an event to which Fiorina Jr. was sent at the expense of Plastic Dental/Intelldent along with the company's other directors and officers to conduct the business of Plastic Dental/Intelldent. In short, the business opportunity represented by this idea or concept was the property of Plastic Dental/Intelldent. In addition, this is the type of information, a new concept and product idea, whose value lies in large part in being the first to employ it. Therefore, it constitutes prototypical confidential and proprietary information.

To justify a preliminary injunction, the plaintiff must show that it is likely to succeed on the merits of its claims, it is likely to suffer irreparable harm without an injunction, the harm it would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants, and that the injunction is in the public interest. *Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765, 769 (7th Cir. 2011).

Plaintiff's claim is based on an alleged breach of fiduciary duty.[1] In order to prove breach of fiduciary duty, plaintiff must prove (1) the existence of a fiduciary duty; (2) breach of the duty; and (3) that the breach proximately caused the damages. *Brown v. Kinross Gold US.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008). As officers and directors, the Fiorinas owed Plastic Dental/Intelldent "their undivided loyalty, good faith, honesty and full disclosure." *Leavitt v. Leisure SportsIncorporation*, 734 P.2d 1221, 1228 (Nev. 1987). Directors and officers breach their fiduciary duty if they "exploit an opportunity that belongs to the corporation." *Bedore v. Familian*, 125 P.3d 1168, 1173 (Nev. 2006) (quotation omitted). "An opportunity belongs to the corporation if it is one in which the corporation has an expectancy interest or property right." *ld.* Furthermore, the resignation of an officer does not diminish liability for transactions that he attempts to complete after his resignation, if the transaction began during his employment. *See Dowell v. Bitner*, 273 Ill. App. 3d 681, 691 (Ill. App. Ct. 1995); *Alpha Sch. Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 737 (Ill. App. Ct. 2009). Moreover, even assuming arguendo that a former officer or director did not begin competing with a corporation until after his resignation, he would remain bound by his fiduciary duty not to undertake a transaction founded on information acquired during his employment. *See Dowell*, 273 Ill. App. 3d at 691; *Comedy Cottage v. Berk*, 145 Ill. App. 3d 355, 360-61 (Ill. App. Ct. 1986).

The evidence is clear that the Fiorinas started to exploit a business opportunity resulting from Intelldent's work product to which they were privy only in the course of their relationship as employees, officers and directors of the corporation before they resigned from the corporation and continued to do so after their resignations. They withheld information from Plastic Dental/Intelldent about the pricing and feasibility of manufacturing the prototypes that they had created as employees, directors and officers of Plastic Dental/Intelldent even though Fiorina Sr. had, as an employee of Plastic Dental/Intelldent, agreed to obtain that very information for the corporation's use. Instead, Fiorina Sr. attempted to hide the information from Plastic Dental/Intelldent and used it to develop his own new product. The Court finds the plaintiff has proven a reasonable likelihood of success on the merits of its breach of fiduciary duty claim as to the multi-piece ultrasonic tip, the Vari-Tip.

Plaintiffs have also established a likelihood of success on the merits of their breach of fiduciary duty claim as to the "F file." This product was conceived and created by plaintiff with the assistance of Mark Fiorina Senior while he was employed by plaintiff for that very purpose. International Plastics was given the contract to manufacture the "F file" for plaintiffs. Plaintiffs continued to sell the "F file" after the Fiorinas became officers and directors of Plastic Dental/Intelldent and International Plastics continued to manufacture the "F file" for plaintiffs

---

[1] The Northern District of Il1inois has recognized that, "[t]he established rule of conflicts law is that "[t]he corporate law of the state of incorporation is controlling with respect to the fiduciary duties. of its directors as well as other internal corporate affairs." *Regal-Beloit Corporation v. Drecoll,* 955 F. Supp. 849, 858 n. 3 (N.D. Ill. 1996). Thus, because Intelldent is a Nevada corporation, Nevada law applies with respect to Intelldent's breach of fiduciary duty and theft/usurpation of corporate opportunity claims.

until the Fiorina defendants caused it to stop doing so and to start manufacturing the "Finishing File," essentially the same product, using the same molds, for themselves. (Mark Andrew Fiorina Dep. 86.) The Fiorinas, as former officers and directors of plaintiff, violated their fiduciary obligations by utilizing information they became aware of before and during the time they were shareholders and officers of plaintiff to compete with plaintiff.

Plaintiffs will suffer irreparable damage if defendants are allowed to exhibit and sell the Vari-Tip and/or Finishing File products. Plaintiffs will lose the advantage of being the first to introduce the new concept of the ultrasonic vibrating tool with replaceable tips. The precise value of such an advantage, though undoubtedly great, would be impossible to quantify. Furthermore, Dr. DeVengencie's testimony is that he tested the multi-tip product being sold by defendants and based upon his education, training and experience, it is inferior to the product that plaintiff has developed. Thus, the market for this brand-new concept would likely be tainted by the introduction of an inferior product. The value of the lost business opportunity resulting from the taint would be impossible to quantify, albeit very real. Furthermore, plaintiffs are being prevented from finalizing arrangements for the manufacture and sale of their variable tip product because the companies with which they are negotiating have refused to conclude any arrangements while the dispute with defendants is ongoing. Finally, the defendants have entered into an employment agreement which presumes irreparable injury when an employee breaches a confidentiality agreement or a restrictive covenant.

The harm plaintiff will suffer without an injunction is greater than or equal to the harm that such an injunction, if improvidently granted, would inflict upon defendants. An injunction would prevent defendants from selling the product in the marketplace, but would affect only a portion of their income, while the inability to market its product in the face of Defendants' unfair competition and/or the tainting of the marketplace by the use of Defendants' inferior product would likely cause plaintiff to go out of business altogether.

Clearly it is in the public interest that fiduciary obligations of officers, directors and employees of corporations be enforced.

Finally, the Court is not impressed with the defendants' unclean hands defense. Whether some of plaintiff's owners, as opposed to plaintiff, made untrue declarations in a patent application in their own name is of little relevance to this case. This is not a cause of action to determine or enforce patent rights in a particular invention, nor is the plaintiff in this case seeking a patent on any product. It is unclear at this point in time who is the inventor of an exchangeable tip ultrasonic vibrating dental tool for purposes of establishing patent rights. The issue before this court concerns only the alleged breach of fiduciary duties. As to that issue, no credible evidence of unclean hands has been presented.

Wherefore, the Court temporarily restrains Defendants (and anyone acting on their behalf, in association with them or in concert with them) from utilizing any information, either directly or indirectly, obtained by the Fiorina Defendants at any time while the Fiorina Defendants were officers, directors and/or employees of Plastic Dental/lntelldent and orders

them to return all such information to Intelldent, from advertising or putting into commerce products labeled by Engineering Endo as "Finishing File" and/or "Vari-Tip," or any products substantially similar to the same including, but not limited to, advertising, displaying or otherwise putting such products into commerce at the Chicago Dental Society Mid-winter Meeting between February 21 and February 23, 2013. Said restraining order shall be effective commencing at 9:00 a.m. February 22, 2013 and continue through 9 a.m. March 4, 2013. Plaintiff shall post a bond in the amount of $10,000.00 by 4:00 p.m. on February 25, 2013.

Dated: February 22, 2013

**SO ORDERED**  **ENTER:**

*[signature: Ronald A. Guzmán]*
----------------------------------------
**RONALD A. GUZMÁN**
**District Judge**